The court will proceed now to appeal 1931-20, Ramirez v. Tegels, and we'll hear first from Mr. Witwer. Good morning, judges. May it please the court, my name is Jake Witwer. I'm an assistant attorney general with the Wisconsin Department of Justice on behalf of the respondent appellant, Lizzie Tegels in this case. To prevail on his claim of ineffective assistance of appellate counsel, Ramirez must show both deficient performance, the unraised Crawford claim is clearly stronger than the claims actually raised, and prejudice that there's a reasonable probability that raising the claim would have changed the outcome of the appeal. He shows neither. He cannot meet the clearly stronger test because, like the claims counsel I actually raised on direct review, the Crawford claim was also weak. That is because, first, it was forfeited, where no confrontation objection was raised at trial, and counsel could have reasonably believed, based on that fact alone, that the state court would have denied the claim. The claim also lacked merit. The child victim's out-of-court statements were made while receiving medical treatment for a sexual assault that occurred just hours earlier, perhaps an hour earlier, and the United States Supreme Court has since declared that statements made in such circumstances are non-testimonial. Counsel, I have a question about evaluating the confrontation clause arguments. So Jackson says that we can look at those arguments with hindsight, but my question in Jackson, hindsight significantly helped the defendant. Here, you know, what if we were to think that Clark hurt the defendant's arguments? How much should that play in? In other words, should we be evaluating whether the confrontation clause arguments would succeed if made today, or are we to be evaluating it from the perspective of the court at the time of the appeal? Well, as I argued, I believe that we can take into account all of the developments since the case became final in 2007, including the statements of the United States Supreme Court about statements made for the purposes of medical treatment being non-testimonial, and that's because it's the state's position to waive retroactivity. And I think here, too, the primary purpose test was already in effect by 2007, and in the Davis case, and while it hadn't been fully fleshed out until later, there were other developments, too, including some circuit court cases that established that statements made for purposes of medical treatment are presumptively non-testimonial. So I think that we can take into account and should take into account later developments that further develop what the meaning of the primary purpose test is. It was established while the case was on direct review and should be taken into account here. Has there been Wisconsin state court cases subsequent to the appeal that flesh out how the confrontation clause would apply in this context? Sexual abuse on a child, I mean. I don't have any published cases on point in Wisconsin that would address that. There, my understanding is that there have been some unpublished cases dealing with sexual assault nurse examiners that do not necessarily have precedential value, but I do not have, I'm not aware of any published cases to that effect. Thank you. Does it matter if we're evaluating the deficient performance prong or the prejudice prong if we look at the case law at the time versus the developments since then? I think that they would apply to both prongs, both the clearly stronger prong and the prejudice prong, whether it's a reasonable probability of success on the merits. I think that they're relevant to both. I can't, the two are so closely related. They ultimately do look to what the strength of the claim is. I would argue that the prejudice, at least as applied to this case, is a somewhat stronger standard than clearly stronger because it's possible that you would have a claim that might be clearly stronger than very of a different outcome is still less than a reasonable probability under Strickland. So I can't, I can't, I don't see why it wouldn't apply to both. Mr. Whitmer, this is Judge Flom. Yes. When Mr. Romero's case was still pending on review in 2006, the Supreme Court decided Davis versus Washington. What would be the effect of that decision? Well, I think one of the main effects would be that it first mentioned the primary purpose test, which was later developed by the court in Bryant and most recently in Ohio v. Clark. But it's also relevant, I think, in that here we have a case that has elements of an, well, there's an arguable emergency here as well. The assault occurred perhaps an hour earlier than she arrived in the hospital and there was a need to determine who, if in fact, not who, if in fact this assault actually occurred. And much like there was a need in Ohio v. Clark to determine if an assault occurred, who the perpetrators of an assault of a three-year-old were in that case. And while it's not a 911 emergency like in Davis, there certainly is an investigative emergency here to determine how credible this claim of assault is and to secure the safety of the child. Can I ask a question about the safety of the child? This is Judge Barrett. Judge Peterson thought that some of the statements that the child made to the nurse and the doctor in the context of the medical examination may have been testimonial and others not, specifically those giving more of the details about who the perpetrator was, etc. Is there anything in the record to support that these questions were being asked because there was a concern about whether the mother had been complicit and therefore whether it would have been safe to release M.R. to the mother? I am not aware of there being anything in the record to support that theory. The testimony of the doctor and of the nurse and of the police officer all indicate that the mother, she was the one that reported the assault, was deeply upset by what she had discovered. And she was actively involved in asking questions of her daughter during the medical examination. I think that's an interesting theory. It's possible that the child, certainly we would want to make sure that she was safe with the mother, but in this instance I think she was acting as the child's advocate here before she changed her position later in the litigation. So I would argue that the victims out of court statements that were made while receiving medical treatment, if you look to the totality of the circumstances of the examination in the hospital, and I believe that the totality of the circumstances indicate that this examination was for the purposes of medical treatment and not for forensic examination or investigative purposes primarily. Mr. Whitworth, this is Judge St. Eve. That might explain some of the questioning about the incident that she was taken to the hospital for, the 1999 Labor Day incident. How would that I think that it explains it because in any medical examination of an eight-year-old child who has just been sexually assaulted, an obvious question has to be, did this happen before? Is this the first time that this happened? And that's necessary to determine what the extent of the child's injuries are, what her psychological needs are, what treatment is appropriate for this child. What about the questioning of who had done it to her before? How would that be relevant to medical questioning? About who had done it to her before? Yes. I don't think that there's an issue here about who did it. It's just a general, the question that we're talking about here is after she discloses what happened in 1999, just an hour earlier, two hours earlier, they ask her, was this the first time this happened? They didn't ask, is this the first time he did it? It's not specific to him. Perhaps it's understood, but then the mother comes in and you were in the hospital for where you suffered this vaginal injury. Was this because of, did he do this to you? And she says that yes, he did. I think that in the totality of the circumstances, this is primarily for medical treatment. It's not primarily for investigative purposes. What about the questions the nurse asked her along the lines of regarding the 1998 incident? Why didn't you tell anybody about this sooner? How would that go to medical treatment? Perhaps that question might, but I think it's also relevant to what her investigative purpose and a medical purpose is. That's almost always the case in these questions here. But I think that it would also be primarily medical. And most importantly, I think that the first question where she reveals that what happened to her in 1998 was a sexual treatment. And again, that's because it occurred in the emergency room. It was conducted an hour or two at most following the suspected assault. The nurse and the doctor, they're not forensic medical professionals, like a sane nurse. They were not following some sort of investigative protocol under the direction of the police officer. While the officer was present in the room for the beginning of the examination, he had left the room by that time and was not present when the nurse asked the question about whether this was the first time it happened. That issue is disputed, isn't it? I don't think that is disputed. I think that Ramirez effectively conceded that point in his reply brief. And I can find that reference here in just a moment. Counselor, can I ask you a question about whose intent matters? So Michigan versus Bryant tells us that it's not just the declarant, but it's also the investigating officers in that case or here. It would also be the nurse doctor and the officer, that we also look at their motivation. But putting somewhat more weight on the declarant. And how do you think those factors play out when the declarant is a child? If we're thinking about Clark's admonition that children have less of an understanding about how the criminal justice system works, that even if the nurse had some desire to try to get on the record some information that might be used in a later prosecution, does it matter if that would have been unclear to the child? Yes, I think that it certainly does matter. It's hard to imagine an eight-year-old child in these circumstances, an hour or two after being sexually assaulted by her father, scared in an emergency room, having any sense of what she's doing is going to be for the purposes of the prosecution. And I think that that matters to the analysis greatly, especially after that case. I see that I'm up to my 15 minutes here. I'd like to reserve, unless there are other questions, I'd like to reserve the last five minutes for rebuttal. Mr. Woodward, you're now slightly into your rebuttal time. You have four minutes and 50 seconds left. I would like to reserve my time for rebuttal. Thank you. Thank you, Mr. Woodward. Ms. Veit? Thank you, and may it please the court. In 2005, it was obvious that Antonio Ramirez's case presented a significant Crawford issue. He was convicted in large part based on hearsay statements that weren't tested by cross-examination. Now, Your Honors, I've asked a number of questions about sort of the law in 2005, the law now on the Confrontation Clause, but I don't think that this is the case where this court kind of decides that particular legal matter for a couple of reasons. First of all, both in 2005-2006 when the direct appeal was pending and also now, this is not like a pure question of law the way that the state is setting it up of is this, you know, any statement that is in the course of medical treatment is not testimonial and therefore, you know, Mr. Ramirez obviously loses. It's a highly contextual analysis, and each case is going to be a little bit different in terms of the sort of interviews that we're talking about here where we have medical personnel talking to somebody, but that somebody was driven to the medical personnel by police officers who understood that she was part of a police investigation, and they were collecting evidence at the same time they were also performing some medical duties. It's a complex analysis that has to happen that's highly contextual. And then the second reason that I don't think this court needs to be too concerned about any distinctions in the law between then and now, although I'm not sure there are many, is that it is not for this court to declare that the primary purpose of the questions that were asked of MG in this case were for medical or were for legal. The question is whether there's a reasonable probability that if Mr. Ramirez finally got the appeal that he is entitled to with probability that the Wisconsin courts would rule in his favor. And that's both because that's what the law says and it's really consistent with the whole idea of habeas with comity between courts and federalism. We need to, this court should be allowing the Wisconsin courts to finally look at the only substantial constitutional issue that Mr. Ramirez's case raised. Ms. Feit, this is Judge Barrett. How much space is there between the clearly stronger standard for evaluating deficient performance and prejudice? Could you think that an argument, say the Crawford argument here, was clearly stronger yet still wouldn't have a reasonable probability of success on the merits? I don't see why that wouldn't be possible. I mean, sure, you could have a claim that is clearly stronger than other claims, but also there's no reasonable probability of a different outcome. It is tricky because this court has said that even in the prejudice analysis, to some extent, it's a relative analysis. So if the claims that were raised had a zero percent chance of winning and the claim that was not raised that's clearly stronger, I hate to put percentage on it, but let's say had a 30 percent chance of winning, then I think that's highly relevant to whether there's a reasonable probability of a different outcome. And I think this case is really the poster child for why it doesn't make sense for this court to kind of put itself in the role and pretend like it is the Wisconsin court system either in 2006 or the because we have so many layers. We first have what we've already been talking about, this highly contextual analysis of a forensic slash medical examination where somebody was driven by police officers to the hospital to collect evidence on a suspected sexual assault at a time when the perpetrator had been arrested already, so there was no ongoing emergency. So it's not an easy question. Reasonable jurists could certainly disagree. And in addition, the state has repeatedly raised this state law matter of Wisconsin's forfeiture doctrine, which, you know, as you can see from the briefing, which got pretty lengthy in all the briefs, Wisconsin's forfeiture doctrine is pretty unusual and it's complicated and it's a state law issue that is really not for this court to make a guess as to how individual judges might apply a discretionary doctrine in a particular case, particularly where we have the weirdness of, you know, are we looking at the district two court of appeals judges in 2005 and 2006, who are actually completely different? There's been a total turnover in district two or looking at them now in Wisconsin Supreme Court is the same way. There's been largely a turnover of the justices. And I think that's where this court has to say that in the prejudice analysis, what we're looking at is this is a significant and very serious issue that his attorney should have raised. It was clearly stronger than the issues that she did raise. And because she didn't raise it, he effectively did not get an appeal. I mean, he certainly didn't get an appeal with competent counsel. And now this court can, you know, as Judge Peterson ruled, can turn this over to the Wisconsin appellate courts to rule on this substantial and serious legal controversy. Ms. Feith, this is Judge St. Eve. The Circuit Court of Wisconsin in denying the Rothering petition, not the Knight petition, but the Rothering petition, evaluated these statements and made a determination that they were either not testimonial or they were harmless. Why shouldn't we defer to that determination? Well, I mean, that determination is something that the Wisconsin appellate courts would review de novo. The analysis the Circuit Court made is pretty muddled. A lot of it seems to suggest that because it's an excited utterance, it's not testimonial, which of course, that's not the analysis. Also, Mr. Ramirez did not have an attorney in his 974-06 motion, the Rothering motion. This is a claim he should have been able to raise via 809-32H. And under that procedure, under a direct appeal procedure, he would have had an attorney who could have made a cogent legal argument both for the Circuit Court and for the appellate courts. And so it wouldn't make sense for this court to look at what a decision a judge made in a pro se case that would be reviewed de novo anyway. And the entire point of Mr. Ramirez's claim is that he was denied a competent attorney to help him through his direct appeal. And that's all we're asking for. But this is a habeas case, and there are circumstances certainly where determinations are made where we give and where the claim has been addressed. I understand there's a Rothering petition here and a Knight petition, and we may look at them differently. And it's been brought up through the Knight petition. But if you focus on the Rothering petition, why wouldn't we do that and give the AEDPA deference to the Circuit Court's determination about the challenge statement? Well, the parties agree you don't give AEDPA deference to that because the last state court to rule on the issue ruled on it in a different way, in a way that we both agree was unreasonable. And so the look through from one decision to another just simply doesn't apply in this circumstance. That's kind of the technical reason. But in addition, in a practical sense, again, because the entire purpose of this case is the denial of effective counsel and appeal, he was raising an issue under Rothering that should have been raised under 80932H, where it would have been in a completely different posture, and it would have had a legal analysis by a lawyer. But again, I don't think that there's any question that this court does not owe any deference to that decision. Like any other decision, whether it's a Wisconsin trial judge or an Eighth Circuit decision, this court, to the extent it thinks something is persuasive, it can certainly look at that. But the decision on the Rothering motion in this case is not at all persuasive, and it's not surprising given that it was an order entered on the basis of an uncounseled pro se argument. There are, let's see, a couple things that were, that came up during the state's initial argument that I want to address. Just wait, before you do that, if we could focus on the prejudice prong for a moment. How should the DNA evidence that clearly linked Mr. Ramirez to the crime impact our analysis of the prejudice prong, especially with respect to the 1999 incident? Sure. I think the parties are in agreement that the relevance of that evidence is in whether the Wisconsin courts would hold that a confrontation clause violation was harmless under the Chapman standard. And so if the Wisconsin court, like if there's a reasonable probability that it may have granted relief on the confrontation clause claim, if not for harmlessness, I certainly think it's relevant to that extent. It's not relevant to the, in this case it's so complicated because of all the layers, but it's not relevant to the prejudice on appeal except for, I think, by harmlessness. And, but the response to the potential harmlessness argument there is simply that, you know, this case DNA evidence does look, you know, generally pretty negative, but in this case everything was really unusual where you had a mother testifying that she had coached her children to lie, that she had lied, that this was all this scheme to get back at her spouse who was cheating on her and had embarrassed her in front of her family. And so in the context of the entire case, I don't think this court can feel the sort of certainty that the Wisconsin appellate courts would make a harmlessness ruling, a harmlessness beyond a reasonable doubt ruling, that it would, that that would take away the reasonable probability of a different outcome. And of course on the 1998 charges, it's a completely different matter. But even on the 1999 charge, there was so much other confusing evidence and evidence that the defense was able to point to to show that, you know, really the story that this was made up was entirely plausible. What about her testimony? What about the mother's testimony that she adamantly denied planting any of the evidence? She did recant her statements, but the physical evidence that the DNA test was taken from, she adamantly denied that she'd had anything to do with toying with that or planting that. Sure, I don't know if I would use the word adamantly. She certainly, she denied it on the record. You know, the defense suggested that given the sort of problems that would create for her to be planting evidence like that, the jury could believe that were not true. And then of course, the other thing that's kind of lurking in the background of this case is that prior to the trial happening, both the DA and the defense counsel noted on the record that MG intended to recant her own statements to police officers and doctors if she testified. But of course, she didn't testify. And so the harmlessness, again, it's like the reasonable probability prejudice standard, but then looking at would the Wisconsin appellate courts find a confrontation clause violation harmless, I think is too uncertain for the court to rule in that way. I think there's still a reasonable probability of a different outcome here. And again, when this case is over, then the court will turn this over to the Wisconsin courts so that Mr. Ramirez can have a counsel appeal and we can sort through all of these. And you know, the state is making a whole bunch of different arguments regarding this case, and it will have the opportunity to raise all of those arguments in the state courts. It's just that this court is not in the best position to decide them. All this court needs to decide is there is a reasonable probability of a different outcome. All right. Do you have anything further, Ms. Fine? I guess just one more thing I'd like to mention that your honors have not had too many questions about Wisconsin's forfeiture doctrine. So perhaps you are in agreement with me that it's just this court is not in a great position to decide how individual judges might rule on that. But one thing that hasn't come up at all in addition to it is just, you know, there are really three things that would be absolutely in play if the state were to have raised forfeiture or if the state were to raise forfeiture in the future. And that's that there's absolutely room to argue it's not forfeited here, that Wisconsin's post-conviction procedure is just so unique that in a lot of cases people are able to raise unpreserved issues at the 809-32H motion level, which are heard and then not deemed forfeited, and then also the discretionary nature of the call. And I would just ask the court to affirm the district court's ruling so that Ramirez can finally get the appeal that he's entitled to. All right. Thank you, Ms. Fine. We'll turn back to Mr. Whitworth. Your Honors, I would just like to respond to a few things here. Because the question really, I think we're both in agreement that the question is whether there's a reasonable probability of success on the merits. That is that there's a reasonable probability that the outcome of the appeal would have been different. That I think requires that court do dip into some of the issues that Mr. Ramirez doesn't want the court to delve too deeply in, including the likelihood that state courts would find this claim forfeited. I would dispute the contention that Wisconsin's forfeiture doctrine is all that confusing. It's fairly standard that if a constitutional claim isn't raised in the trial court that it can't be raised in the appellate courts. And the United States Supreme Court has indicated that unpreserved trial errors are generally not or plainly not going to be a stronger ground for appeal than preserved errors. And this is one of those cases. And the reason for that is because as this court held in Carina v. Thuritt, 853 F. 2nd at 1417, counsel could have reasonably believed that the court would deny the claim as forfeited. So I'm not saying that this is necessarily the end of the analysis, but I do think that it's highly relevant to whether the claim is, in fact, clearly stronger and whether there's a probability of a different outcome. I would add on the DNA analysis, if you read the mother's testimony, it's inherently incredible. And it's while she has, while we've talked about how she says that she coached the children and such, her primary response to the statements that the child made in the medical examination, that is her statements about what happened in 1999, just an hour or two earlier, and what happened in 1998 is just to say, oh, she never said that. She never said that to the doctor. She never said that to the nurse. It's not primarily that she coached them to lie. It was that the child didn't actually say those things in the examination. And that's just, to believe that, you would have to believe that there's some conspiracy involving the doctors and the nurse and such. And it's, the Wisconsin courts would have had little problem finding that the 1999 claim, that it was harmless, that any admission, assuming that admission of testimony, assuming there was admission of testimonial statements under Crawford, that those statements would have been harmless because of the DNA analysis, and because the lack, the really total lack of credibility of the mother's version of events. And on top of that, that there was plenty of narrative that establishes that, how that DNA got on the child's clothes and legs and body. And so, in conclusion, I would just say, I would just ask the court to reverse the district court's ruling, granting relief, and to dismiss the petition, unless there are any further questions. Thank you, Mr. Whitmer. Ms. Veit, the case is taken under advisement, and the court will proceed.